**HARBISON–WALKER REFRACTORIES COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 17477, 17478.**

United States District Court
W. D. Pennsylvania.

Complaint filed Dec. 5, 1958.

329

Kenney, Stevens, Hill & Clark, Pittsburgh, Pa., for plaintiff.

Gustave Diamond, U. S. Atty., Pittsburgh, Pa., for defendant.

ROSENBERG, District Judge.

These two consolidated actions were brought by Harbison-Walker Refractories Company, plaintiff, against the United States of America, defendant, for the recovery of payments of income and excess profits taxes for the taxable years 1951 and 1952. They were brought by authority of the provisions of Title 28 U.S.C.A. § 1346 [1] by virtue of possible entitlement by the plaintiff to depletion allowances as provided under Title 26 U.S.C.A. § 23 [2].

While the original actions revolved about a number of issues, all but one of these have effectually been resolved by the enactment of certain legislation and by the agreement of the parties. The question primarily remaining for determination is: Was the yield from the plaintiff's Allyn Quarry at Nelson, Ohio, during the years 1951 and 1952 quartzite or gravel and sand? If it was quartzite, as the plaintiff contends, the depletion allowance for each of those two years should be 15% in accordance with subsection (iii) [3] of § 114 (b) (4) (A)

1. "§ 1346 * * * (1) Any civil-action against the United States for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;"

2. Internal Revenue Code of 1939:
"§ 23. Deductions from gross income.
"In computing net income there shall be allowed as deductions:
*       *       *       *       *
"(c) (as amended by Sec. 202(a), Revenue Act of 1941, c. 412, 55 Stat. 687) Taxes Generally—
"(1) Allowance in general. Taxes paid or accrued within the taxable year, except—
*       *       *       *       *
"(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. * * *"

3. "(iii) [I]n the case of metal mines, aplite, bauxite, flurospar, flake graphite, vermiculite, beryl, garnet, feldspar, mica, talc (including pyrophyllite), lepidolite, spodumene, barite, ball clay, sagger clay,

of the Internal Revenue Code of 1939, as amended 26 U.S.C.A. § 114. If it was gravel and sand as the defendant contends, the depletion allowance should be 5% in accordance with subsection (i) [4] of that section.

Since the application of law and fact here is retrospective in that the material production accrued in the years 1951 and 1952, and since counsel and the witnesses at trial treated the subject matter almost entirely in the present tense, we shall here, for the sake of convenience, also make reference in the present tense.

The plaintiff is engaged in the business of producing refractories—products designed to retain their physical shapes and chemical identities when subjected to high temperatures. Plaintiff's refractories are used in industrial application requiring high heat resistance such as in smelting and refining furnaces used for ores, ceramics, chemicals, and the like. The plaintiff relies on its sources of supply for its raw materials from the natural mineral deposits of four quarries situated variously in Alabama, Pennsylvania, Wisconsin and Ohio. In Alabama the plaintiff's quarry lies in the Weisner quartzite formation. In Pennsylvania its quarry is situated in the Tuscorora quartzite formation. In Wisconsin, its quarry is situated in the Baraboo quartzite formation, and in Ohio its Allyn Quarry lies in the Sharon Conglomerate formation.

The material procured from the first three of these quarries is hard, dense, solid rock existing in its natural state as large compact masses in which the individual grains and cementation have become inseparably blended and tempered in nature's processes so that when the rock is fractured, it breaks through the grains rather than around them. The deposits in which these three quarries are located were formed by nature by the metamorphic process [5], while the deposit where the plaintiff's fourth quarry, the Allyn Quarry is situated in Ohio, was formed by nature by the process of sedimentation.[6] The deposits in the first three formations exist variably in places up to 400 feet in thickness and spread. The Ohio deposit at the plaintiff's Allyn Quarry is of a thickness of 40 feet or more (although in parts of the state it is very much more). This deposit is made up of various sized pebbles and sand which nature has bound together in a friable composite sufficiently strong and compacted to sustain the weight of heavy mining equipment in operation at its top [7], and close to the ledge or vertical face of the quarry. Nature has retained the individuality of its component parts while stuck together in this friable mass, and when sufficiently disturbed the mass disintegrates into its individual pebbles and sand grains. The Sharon Conglomerate is an enormous deposit which has been laid down as a sediment principally in Ohio. It runs north and south over virtually the entire length of the state and extends in a band southwesterly from Lake Erie in

china clay, phosphate rock, rock asphalt, trona, bentonite, gilsonite, thenardite, borax, fuller's earth, tripoli, refractory and fire clay, quartzite, diatomaceous earth, metallurgical grade limestone, chemical grade limestone and potash, 15 per centum."

4. "(i) [I]n the case of sand, gravel, slate, stone (including pumice and scoria), brick and tile clay, shale, oyster shell, clam shell, granite, marble sodium chloride and, if from brine wells, calcium chloride, magnesium chloride and bromine, 5 per centum."

5. "Metamorphism, in petrology, is the process of chemical and physical altera- tion that occurs in rocks under the influence of elevated temperature and mechanical stresses in the earth's crust." Encyclopedia Britannica, Vol. 15, p. 321 (1960 Ed.)

6. "Sedimentary rocks are secondary in their origin; the materials of which they are composed have been derived from the weathering of some previously existing rock mass." Dana's Manual of Mineralogy, p. 412.

7. Immediately before quarrying and removal of overburden.

northeastern Ohio to the Ohio River in the south.

It is not, however, so much the conglomerate or its cementation in its natural state with which the plaintiff is interested, but rather with its chemical composition and its various range of pebble and sand sizes. In order to produce its refractories, the plaintiff requires material which is composed of not less than 98% silicon dioxide ($SiO_2$) in a fairly pure state having a minimum of alumina, iron and such other chemical parts. It must have a variation of sizes of material which may be knitted angularly together into a closely compact refractory brick having little or no porosity. The material from all four of the plaintiff's quarries have these requisite characteristics and lend themselves to the making of its refractory products. Accordingly, it uses the material from all four of its quarries indiscriminately to produce its end-product silica brick under the same or interchangeable brand names.

The parties agree that the Alabama, Pennsylvania and Wisconsin deposits are quartzite, and that the plaintiff's quarries in these states produce quartzite. The disagreement relates only to the Sharon Conglomerate in Ohio.

The process of recovery of the product from the Ohio quarry and its preparation has some similarities and some variations from the process of recovery and preparation of the products from the other three quarries. Dynamite is used to break the rock formations in Alabama, Pennsylvania and Wisconsin, and it is also used to loosen the impaction in the Ohio quarry, although more is required for each of the first three operations than for the Ohio quarry. The first three admitted quartzite quarry productions are broken down from large rock masses to the eventual grades of sizes desired. The conglomerate is first reduced to convenient lumps and later (after a washing process) to the individual pebbles and sand grains. The large pebbles are reduced to the required sizes and mixed with quantities of sized sand and adhesive material for eventual shaping and firing.

Drilling and shooting in the quarry is more of a problem with the large, dense quartzite rock formations than with the conglomerate. Washing the conglomerate is more of a problem than it is with the large rocks after they are broken down. Ordinarily, these rocks need no washing except for the accumulation of dirt during shooting, quarrying, loading and trucking. The equipment working in the solid rock formations is not identically the same as that used for the recovery of the material in the friable formations, but the principle of recovery is the same for both.

Physically the formations in their natural states have fundamental differences. As already stated, the conglomerate is a friable mass composed of pebbles and sand with sand making up a variable amount of its density of from anywhere from 40 to 60 percent. Portions of the sand content must be discarded because of the unusable sizes of the grains. Pebbles and sand, as such, are lacking in the quartzite rock formations.

While the pebbles and sand in the conglomerate retain individuality, both before and after quarrying, they are easily separated one from the other, but the quartzite rock can only be fragmented or fractured. Conglomerate is an immense cluster of pebbles and sand, but in quartzite what were once grains and cementation have effactually become one blended mass in whole.

Counsel for both parties have expended a great deal of time and effort in this case. The trial, itself, was courteously but vigorously prosecuted and defended by the parties, and the voluminous briefs of the parties have sifted and refined the evidence down to its minutest details. Both parties have sought to define the law patiently, prevailingly and profoundly. It would, of course, be impossible to comment upon all these innumerable details, but they may be fairly well summarized.

■ The huge, solid compact rock used by the plaintiff from its quarries in Alabama, Pennsylvania and Wisconsin is in itself technically, geologically and petrographically, as well as in its common commercial sense, admitted by both parties to be quartzite. The plaintiff considers the Ohio conglomerate to be the same material—that is quartzite—and the defendant contests such a conclusion because it maintains that the material is gravel and sand. The burden of proving its contention is upon the plaintiff. South Jersey Sand Company v. Commissioner, 267 F.2d 591 (3 Cir. 1959).

To advance its burden of proving that the Allyn Quarry formation in Ohio is quartzite, within the meaning of the Act, the plaintiff contends:

1. The word "quartzite" in the Act was intended by Congress to include the Sharon Conglomerate;

2. The material from the Sharon formation is commercially known in the refractory industry as quartzite;

3. The material from the Ohio quarry is the same as that from the other three quartzite quarries and serves the refractory industry the same end-use; and

4. The material taken from the plaintiff's Allyn Quarry is quartzite according to the judicial interpretation of our courts.

1. Does either the Act or the legislative history of the Revenue Act of 1951 amending § 114(b) of the 1939 Internal Revenue Code reflect an intention in Congress to include the Sharon Conglomerate in Ohio within the term quartzite of such Internal Revenue enactment?

The statute and the Congressional Committee reports are silent as to the precise definition of the word "quartzite" as contained in the revenue enactment. However, the plaintiff maintains that its then president appeared before the Committee on Ways and Means of the House of Representatives and testified for the enactment of a depletion allowance for its Ohio quarry productions; that its Mr. Garber was the only witness to appear before the Committee; and that Congress responded by providing in the enactment the words "refractory and fire clay, quartzite" which included its Ohio conglomerate material.

In 1950 the Committee on Ways and Means held hearings in connection with the development of the new revenue law. At this hearing, Mr. E. A. Garber, the then president of the plaintiff, appeared and spoke in behalf of the refractory producers, as well as for his own company [8], and asked Congress to grant percentage depletion at the rate of 15% to "refractory clay and quartzite", which had not theretofore enjoyed such treatment. The witness referred to "high-grade refractories * * * made * * from quartzite, a hard dense silica rock" [9]. He testified regarding commercial deposits of refractory quartzite (and ganister which occurs in some areas as in Pennsylvania where broken over deposits from the main quartzite formations have fallen down the mountainside), such as that in Alabama, Pennsylvania, Wisconsin and Ohio.

As relates to Ohio, the following statement was made:

" * * * In Ohio a silica rock which may be regarded as quartzite, since it consists mainly of quartzite pebbles bonded together by fine particles of the same material, is mined and is used for the manufacture of refractories." (p. 452)

A map was also presented to the Committee of two areas in Ohio in which deposits of quartzite were to be found.

When the Act of 1951 was passed, § 114 provided a basis for "Depreciation and Depletion" under (A) of that section (For the textual language of Section 114(b), as so amended, see Appendix I). The pertinent parts are subsections (i)

8. Tr. Test., p. 31.

9. House Hearings, 1950 (Revenue Revision) Committee on Ways and Means, House of Representatives, 81st Cong., 2d Sess., Vol. 1, pgs. 441, 452.

and (iii) [10]. Under (i) was contained among terms for 5% depletion these words: "in the case of sand, gravel * * * brick and tile clay * * *". Under (iii) in the category allowable for 15% depletion, the pertinent terms are: "in the case of * * * ball clay, sagger clay, china clay * * * refractory and fire clay, quartzite * * * ".[11]

The plaintiff argues that the positioning of the word "quartzite" immediately after the words "refractory and fire clay" proves that the word "quartzite" included the Ohio conglomerate as a refractory product because the testimony of the plaintiff's witness before the House Ways and Means Committee made inclusive reference to the conglomerate as quartzite.

I am not persuaded that the testimony before the Committee gave the entire Congress the belief or idea that it was legislating into the word "quartzite" an extension which would include the words "Sharon Conglomerate". There is not one word in the evidence of these cases to indicate any connection between the legislation and the Committee testimony, or even that the Committee had been persuaded to the meaning that the Sharon Conglomerate was quartzite. Rather, that there was no persuasion is reflected in the context of the Act itself—in the words which it contains and in the words which it does not contain. It appears obvious that Congress had the plaintiff's business in mind when it legislated, but not the plaintiff's alone. "Refractory and fire clay" relates to the broad field, as does the term "quartzite". It is unreasonable to believe that the word "quartzite" follows the term "refractory and fire clay" and was added for the purpose of bringing the Sharon Conglomerate into higher and equal esteem with quartzite. The fact that the word "quartzite" appears immediately after the words "refractory and fire clay" or

that "diatomaceous earth" follows the word "quartzite", or that the word "tripoli" precedes the words "refractory and fire clay" lends no significance whatsoever that any of these are related. The placement of the various terms appears to lend no legislative consequence for the plaintiff.[12]

■ The plaintiff argues that there were no expert witnesses before the Congressional Committee in 1950, and therefore Congress was guided only by its witness in the enactment of the word "quartzite" so as to include in it the Sharon Conglomerate. We must presume, and we do presume, that Congress knew what it was doing, that it was properly advised by competent experts in the various fields and by the staffs of the various departments related to this enactment, and that it intended to do what it did. But the plaintiff says that an ambiguity exists by reason of the fact that Congress had intended to include Sharon Conglomerate in the word "quartzite". Let us examine this further.

Congress recognized the broad refractory industry when it gave 15% depletion allowance for refractory and fire clay, other enumerated baking or firing clays, additional related minerals and quartzite. If Congress had intended to include, as the plaintiff says, its conglomerate as quartzite, it could have easily used words indicating its intention.

It will be noted that Congress made both inclusions and exclusions in this Act where it desired its intentions to be known. More specifically under (i) after the word "stone" it added in parenthesis "including pumice and scoria"; and after the words "sodium chloride" it added "and, if from brine wells, calcium chloride, magnesium chloride, and bromine". Under (iii) after the word "talc" it added the words "including pyrophyllite". Then, too, under (i) Congress showed its intention when it specified two kinds of

10. See notes 3 and 4 supra.

11. 26 U.S.C.A., 1952 Ed., § 114(A).

12. In the Internal Revenue Code of 1954 26 U.S.C.A., 1958 Ed., § 613 the word

"quartzite" is placed between the words "potash" and "Slate".

shells—"oyster shell" and "clam shell". Under (iii) it specified two kinds of limestone in these words, "metallurgical grade limestone" and "chemical grade limestone", just as it specified "clays" by the words "ball clay", "sagger clay" and "china clay" in addition to "refractory and fire clay". But Congress did not avail the word "conglomerate" in any descriptive variable which would reflect the plaintiff's refractory industry. And we may justly conclude that Congress did not intend to do so.

2. Is the Sharon Conglomerate in Ohio commonly known as quartzite in the refractory industry?

The plaintiff contends that the commonly accepted commercial meaning of "quartzite" within the refractory industry is any silica rock suitable for use in the manufacture of silica brick (plaintiff's brief, page 5).

As already stated, there is no definition or qualification of the word "quartzite" either in the statute, itself, or as a guide to its meaning in any Congressional records or Committee reports. The reference by both parties is to a general statement made by the Senate Finance Committee in connection with the Act, which contained this:

> The names of all the various enumerated minerals are, of course, intended to have their commonly understood commercial meaning. S.Rep. 781, 82nd Cong., 1st Sess., p. 38 (1951–2 Cum.Bull. 458, 485); U.S. Code Congressional and Administrative Service 1951, p. 2008.

Following through on this, the plaintiff urges its theory in such words as those contained on page 4 of its brief:

> "Plaintiff is not here attempting to develop any broad definition of 'quartzite' as this must flow from an industry-by-industry examination. However, it does contend that the term 'quartzite', in addition to any technical definition, must include all silica rock which, by reason of their purity and physical characteristics are used for silica refractories."

At page 8 of its brief:

> "Congress did not, however, limit quartzite to 'refractory quartzite'. Thus the term is to be considered in its general sense and percentage depletion is open to all industry using a silica material which they treat commercially as 'quartzite' whether or not such material is suitable for use as a refractory. The fact that Congress gave more than was requested by the refractories industry does not in the slightest degree derogate from the fact that it was informed that in the refractories industry the minerals extracted from the Plaintiff's Allyn Quarry was commercially quartzite and considered it as such in enacting the Revenue Act of 1951."

And on page 18 of its brief:

> "Harbison-Walker is exclusively a refractories producer and concededly is a member of the refractories industry. The word 'quartzite' so far as the plaintiff is concerned is to be defined by reference to that industry alone rather than other industries using high silica raw materials, whether or not chemically or physically suitable for refractory purposes."

The words "commonly understood commercial meaning" in themselves appear to be both simple and general. As for the word "commercial" alone, we can read into it only the meaning of "for profit (as opposed to non-profit)" and as it includes application to business, trade, commerce, industry and the like, where gain incentive motivates human economics.

But we are here asked to apply a gauge in the words "commonly understood commercial meaning" to the meaning of the term "quartzite". But actually we are not being asked to gauge the meaning of the term "quartzite", but rather to gauge the meaning of the term "Sharon Conglomerate". Then, we are being further asked to narrow or confine the term "Sharon Conglomerate" as its product is adaptable and usable in the refractory

industry. We shall first examine the term "Sharon Conglomerate" in its relationship to the term "quartzite", and as it may have any relationship to the term "quartzite" in the light of the gauge "commonly understood commercial meaning".

The Ohio deposit has been producing raw materials for numerous industries for over a century. The material is variously used for glass sand, engine sand, steel molding sand, foundry sand, ordinary sand, gravel, pebble and tar roofing, concrete blocks, construction material, road building material, refractories and the like. Generally throughout these various industries it is known as sand and gravel. The State of Ohio in its official reports lists the Sharon Conglomerate as sandstone.[13] It is not known to the local people, including truckers and haulers, as quartzite but rather the local people refer to the Sharon Conglomerate as sand, gravel, white gravel, pebble rock, conglomerate or sandstone [14]. From the evidence, as a whole, we may fairly find that in general commercial use in the area, the Sharon Conglomerate is known as sand and gravel.

We have been asked, however, to apply the term "commonly understood commercial meaning" to Sharon Conglomerate as it is known in the refractory industry. From all of the evidence before me, I cannot find that the plaintiff has proven that Sharon Conglomerate is known even in the refractory industry as quartzite.

While accepting the Sharon Conglomerate material as being equally sufficient for its purposes as is the harder material, quartzite, and either interchangeable with it or substitutable for it, there is ample evidence in and out of the industry that this conglomerate material is looked upon as conglomerate, gravel, pebbles and sand. There is no doubt that the refractory industry has found in the Sharon Conglomerate a satisfying mineral for its end-result production, and that it is a satisfactory substitute in any event for quartzite. It is quite obvious that

under these circumstances the industry would like to have it assume the character of quartzite for depletion allowance. But I find no supporting evidence that it is talked about, thought about, or generally characterized in the refractory industry as quartzite. Rather, the opposite is true. Even the plaintiff, itself, has treated it in this manner in its own leasing (Exhibits Nos. 35 and 16); although it does explain it treated or accepted this terminology as a matter of economy. I must draw my findings from the evidence as a whole.

In any event, if we apply the words "commonly understood commercial meaning" only to the refractory industry, it would require that we understand the measuring gauge to be capable of segmentation so that special application might be given to narrow and definite end uses. This is what the plaintiff insists must be done as it says at page 16 of its brief, "The Commonly Understood Commercial Meaning Must Be Ascertained with Reference to the Particular Industry Involved", or at page 18 to the title heading C "The 'Commercial Meaning' of a Mineral in a Given Industry May Validly be Expressed by the Suitability of that Mineral of a Particular Industrial Usage * * *". So the contention is presented similarly in scattered arguments throughout the plaintiff's brief, and a number of authorities are submitted which effectually decide the question of the commercial usage of certain materials for percentage depletion allowances.

As an example of the authorities cited and relied upon by the plaintiff is that of W. R. Bonsal Co. v. United States, 171 F.Supp. 278 (D.C.W.D.N.C., 1959), affirmed in 279 F.2d 465 (C.A.A. 4th) 1960. Here the subject matter for depletion allowance was a gravel product *sold* for road building purposes. It was held here to be quartzite. I have considered the authorities cited by the plaintiff and find that they are for the most part determinative of the material on the basis

13. Tr. Test., p. 286.

14. Tr. Test., pp. 288, 292, 307.

of end-use, or chemical content. They are, therefore, not applicable in our circuit. South Jersey Sand Company, supra.

The plaintiff has presented its proof only in the narrow sense as it affects itself. But authorities, including its own (See Appendix II), show a wider industry than just a silica products industry. In addition to silica, which is used in the largest quantities, kaolin, magnesite, chrome ore and a number of others, and their mixtures are also raw products producing refractory brick, ceramics, porcelain and the like.

If the term quartzite is to be determined in a segment by segment characterization of any industry, we must find something which directs this to be done. I do not find it in the words either of the statute or the term "commonly understood commercial meaning".

In any event, the plaintiff says that this material is orthoquartzite. While the plaintiff insists that the Act is to be interpreted and its meaning found in the Finance Committee's phrase "in their commonly understood commercial meaning" as a gauging device, it has argued (page 20 of its brief) that "technical, geological and petrographical definitions are of but little relevancy", and that further we cannot be governed here by the classic definition of scientists for the word "quartzite". It, nevertheless, offers its experts to show that the truly technical definition of its conglomerate situate in Ohio is "orthoquartzite". It then urges that quartzite has two subdivisions: metaquartzite and orthoquartzite. After reference is made in plaintiff's brief at page 61 to its expert witness, John C. Griffiths, and to page 38 of the deposition of its expert witness, Herbert Insley, it presents the following:

" 'Metaquartzites' are quartzites which have been subject in their present location to the process of metamorphism, that is, at some time in the past they have withstood intense heat and pressure. These metaquartzites meet the classical definition of quartzite in that they are very hard and compact and when broken they fracture across, rather than around the grain. 'Orthoquartzites' are sedimentary quartzites, meaning that through water, air or sliding they have been transported to their present location (R. 318–319). Orthoquartzites generally possess the same compositional makeup as metaquartzites, but because they have not been subjected to the same heat or pressure, they are usually not as hard or compact."

At page 38 of the deposition, Dr. Insley said:

"A. It depends upon what has happened to it since this silica cementation. If it has not been exposed to metamorphism by heat or other processes, I would call it 'orthoquartzite'— which is essentially a quartzite.

"Q. Why is it essentially a sedimentary quartzite, Doctor?

"A. Because it is not a metamorphic quartzite.

"Q. You are distinguishing the sedimentary quartzite from the other? Why are you doing that?

"A. Because of the later conditions to which it was subjected after it was laid down in the cement."

Expert evidence indicates that the word "orthoquartzite is a comparatively new term in this field of science, and it has a variable meaning among different experts. But from the plaintiff's own evidence, it is obvious that orthoquartzite is quite different from metaquartzite and, if metaquartzite is quartzite, then orthoquartzite is quite different from quartzite as such. It would then require from Congress an expression which would indicate its intention to include that term. The plaintiff has admitted [15] that there are other materials which can be

15. Tr. Test., pgs. 353–357.

included as quartzite because of chemical content, such as flint, chert, agate, chalcedony, sandstone, vein quartz, gravel and possibly even granite. If these, too, are quartzite [16] orthoquartzite can have no greater claim than all of these, and there is no evidence anywhere that any of these are includable in the word "quartzite" as stated in the Act.

At page 63 of its brief, the plaintiff argues that there can be no distinction between quartzite and orthoquartzite because if there is the taxpayer would be required to "keep separate books of account for each set of rocks * * *" in order to "be able to correctly compute his depletion at the applicable rate for each mineral".

This argument is persuasive of little, but it is noticeable for its contradiction of a similar contention that different rates for depletion can be allowed for users of conglomerate as quartzite and for users of conglomerate as gravel, since owners of conglomerate have a right to use it for both.[17] I can see no help for the plaintiff in these contentions.

3. Do certain similarity characteristics of Sharon Conglomerate to quartzite, which provide similar end-uses, entitle this material to classification as quartzite?

The plaintiff contends that all material from the four quarries is similarly imbedded and similarly removed and processed and that its refractory product requires a raw material of similar content, similar purity, and similar working characteristics. Therefore, it urges that the Ohio conglomerate has common charac-teristics with that of the Alabama, Pennsylvania and Wisconsin quartzite.

While, as already set forth, the removal and processing of all the materials by the plaintiff have some method in common and some variations as well, it is not so much the removal and processing to which we must look for the ascertainment of what the material is, as to the material itself. There can be no gainsaying that the conglomerate is made up of pebbles [18] and sand [19]. Pebbles and sand are the components of gravel [20].

But the plaintiff says this is not an ordinary kind of pebbles and sand. First, these come stuck together so effectually as to make of all the individual parts a whole rock capable of withstanding the weathering of its quarry face for more than twenty years and capable of sustaining heavy equipment within five or six feet of its quarry face.

In this argument the plaintiff points out a very significant difference between a twenty-year weathering characteristic in the conglomerate as against the weathering of the contents of the other three formations during eons of time. It contrasts (rather than compares) the combination of the friable mass, which can be disassembled into its component pebbles and grains of sand, as against the mass of quartzite, which is so hard that it can be broken down only into new fractures through the integral material of what has long ago lost the separation of its grains. Then, too, the plaintiff admits the conglomerate is a softer (if softer is here the appropriate word) material than is the admitted quartzite.

16. Tr. Test., pgs. 353–357, 427.

17. Page 18, infra.

18. Pebbles are small, usually round stones, especially when worn or rounded by the action of water; transparent and colorless quartz, rock crystal, brazillian, sedimentary rock, rock formed of mechanical, chemical or organic sediment; also defined as material or a mass of material deposited (as by water, wind or glaciers). (Webster's Third New International Dictionary, 1961 Ed.)

19. Sand is a loose material consisting of small, but easily distinguishable grains usually less than 2 millimeters in diameter, most commonly of quartz resulting from the disintegration of rocks, etc. (Webster's Third New International Dictionary, 1961 Ed.)

20. Gravel is a loose or unconsolidated material consisting wholly or chiefly of rounded fragments of rock, ranging in size from 2 millimeters to a meter or more in diameter. (Webster's Third New International Dictionary, 1961 Ed.)

In the long ago, both the true quartzite and the Sharon Conglomerate may have had common or similar origins, but they are not now the same. The conglomerate may be in fact quartzite for the plaintiff because it so serves its purpose, but that does not make it quartzite. The conglomerate is simply gravel of a particular quality or composition. On the other hand, quartzite is a hard, clean, fine material which like fine wine has been "aged" in "terrestrial vats" and has been preserved until now for the finest uses to which man may put quartzite. That he may break it, and use it in concrete as he does gravel, does not derogate its character.

Considering the plaintiff's theory that branches of an industry may be gauged by the words of the Senate Finance Committee as this Act relates to that branch as an industry, it is upon the end-result of the products from the four quarries that the plaintiff bases so much of its reliance that they are in fact all one and the same. All of this lends less support to an assay of the material, itself, than to the evaluation of its end-use, and in so doing substitutes the particular end-use for the substance—but even more so the lesser for the greater. It is like saying that because silver may be used instead of platinum, it is platinum.

The fact that the refractory industry may use the conglomerate as it does quartzite does not make the conglomerate quartzite. And since end-use does not characterize a material as quartzite, the test of whether or not the Sharon Conglomerate is quartzite is not in the fact that these materials have similar characteristics to quartzite which are useful in the plaintiff's manufacturing of refractories.

It is, as stated in H. Frazier Co. v. United States, 302 F.2d 521, at page 525 (Court of Claims, 1962), offered by the plaintiff, that:

"To classify minerals solely by their end-use is one thing, to reach a reasonable interpretation of what Congress intended is another, even though the latter may be shaped and influenced in some degree by the potential use."

Second, the plaintiff urges that the conglomerate is chemically and characteristically similar in all ways, except in size ranges, to quartzite. If there is any merit in the plaintiff's persuasions, it should be here. From the vast amount of the evidence in the case, there is some proof that the Sharon pebbles and sand may have once been huge masses of quartzite and that nature by its miraculous long-time processes has "converted" the massive rocks into its present formation in Ohio. But the fact is that nature did change it, and it is now pebbles and sand.

However, the plaintiff urges that this is quartzite pebbles and sand and should be given a 15% depletion allowance. In this connection it also offers an answer to an objection raised by the defendant that other users of the Sharon Conglomerate would be receiving only a 5% depletion allowance on the same material for which the plaintiff would be receiving a 15% depletion allowance. The plaintiff argues, while this in fact would be so, a variable rate would be both proper and legal because Congress had intended the refractory industry should receive a 15% depletion allowance and had authorized only a 5% depletion allowance for the gravel industry.

Perhaps Congress had intended to do this, but I can find nothing which would support that theory. Rather, it would seem that by permitting variable depletion percentage allowances for a product which had variable uses, a multiple rate system must of necessity arise which could become complicated and confusing unless Congress provided methods or schedules. Assuming, however, that Congress did intend to have different rates apply to the Sharon Conglomerate as 5% for gravel and sand and 15% for its application by the refractory users— the converse would also be a fair practice. Then the owners of true quartzite who use it as a substitute for gravel in

concrete mix, must be given depletion allowance of only 5%. Under such circumstances, we would disobey the Congressional direction of allowing 15% for quartzite since no direction is given for allowance of anything less, no matter how it is used.

The fact that the product serves the plaintiff equally as well in the refractory industry as does quartzite, does not make it quartzite. It is pebbles and sand of a particular quality or composition. The Act recognizes sand and gravel only as such, and not by its quality, as entitling it to a depletion allowance of 5%.

In South Jersey Sand Company, supra, at page 593 of 267 F.2d, Judge McLaughlin, speaking for our Court of Appeals said,

"The circumstances that quartzite may be reduced to sand prior to being used in the glass industry does not reflect Congressional acceptance of the two products as identical. The statute allows the fifteen per cent depletion for quartzite not for glass manufacturing substances."

The same is true here, the fact that quartzite may be reduced to and be intermixed with the Sharon Conglomerate material "does not reflect Congressional acceptance of the two products as identical". Accordingly, we must say the Act allows the 15% depletion for quartzite not for refractory manufacturing substances. The plaintiff can have no help here.

4. Is the Sharon Conglomerate in Ohio entitled to classification under the Act as quartzite, by virtue of judicial determination?

The defendant bases its case, for the most part, on South Jersey Sand Company, supra, as controlling, while the plaintiff bases its contentions on numerous cases outside the Third Circuit. In addition, the plaintiff contends that South Jersey supports its stand that the Ohio conglomerate is quartzite.

The circumstances in South Jersey are factually parallel with these cases. That case, accordingly, controls these. The plaintiff taxpayer in South Jersey claimed that its material was quartzite because its primary chemical content was 98.98% silicon dioxide; that it contained a low iron content of only 0.151%; that it possessed the crystallographic structure of quartz and was angular in appearance; and that it resulted from disintegration of a type of rock formed through cementation by a silica cement of sand grains. It contended that this material was pure enough and of such character as to be adaptable for the manufacture of glass. It concluded that this was therefore fundamentally within the "commonly understood commercial meaning" of quartzite under the pertinent Act. Production was procured by a process consisting of the removal of the overburden. Dredging then removed the sand through pipe lines to screening stations. After screening and washing it was transported to concrete silos where it was stored and dried.

In our cases, the natural Sharon Conglomerate as a friable mass is reduced into smaller lumps by dynamite, and then put through crushers. Here the pebbles and sand fall apart as in the case of the sand in South Jersey. In each instance, the method of removing the individual components from the natural formation is unimportant. It is what is removed which is important. In South Jersey it was altogether sand. In our cases it is 40% or more sand and the balance pebbles of various sizes. The chemical composition is similar. Both have crystallographic structure, and the end-uses are parallel. In South Jersey the end-use was the manufacture of glass. In our cases, it is the manufacture of refractory materials.

Judge McLaughlin in South Jersey concerning legislative hearings said at page 594 of 267 F.2d:

"It is a fair evaluation of those hearings with respect to sand and gravel, particularly industrial sand, that they were considered as completely separate materials with not the slightest indication that they were to be classed or confused with

quartzite. Actually at the 1953 House Hearings, General Revenue Revision, Part 3, p. 2071, a representative of the quartzite industry testified that quartzite is ' * * * a firm compact rock composed of grains of quartz so firmly united that fracture takes place across the grains instead of around them.' The entire legislative history shows, silicon sand and generally sand and gravel to have been accepted in the one group, small separate grains; and quartzite by itself, a compact granular rock, which as such during the critical years was awarded a higher depletion allowance than loose sand and gravel. And we find nothing in the later Section 613 of the Revenue Code of 1954, 26 U.S.C.A. § 613, or its history that lends comfort to petitioner's view that its industrial sand is quartzite. All ordinary definitions of quartzite and sand stress the visible, readily discernible dissimilarities between the two. Quartzite, the hard compact rock. Sand, hard small grains. There is no attempt to merge the one into the other."

This is equally significant in our cases within the meaning of the Revenue Act of 1951. The rock coming from the Weisner formation of Alabama, the Tuscorora formation of Pennsylvania, and the Baraboo formation of Wisconsin are quartzite within the meaning of that Act. Congress specified 15% depletion allowance in clear unambiguous words, and it specified "quartzite" and "refractory and fire clay" as individually separate terms. It did not specify conglomerate or orthoquartzite. And it specified sand and gravel in unambiguous words for entitlement to 5% depletion allowance.

I conclude that Congress, in fixing the percentage depletion allowance for quartzite, contemplated not the end-product, but rather the product in its natural formation. It is not for me to decide that an ambiguity exists, where none does, so that I may arrogate legislative powers and declare sand, pebbles and gravel, lying in a formation such as is the Sharon Conglomerate to be quartzite in order that it may be entitled to a 15% depletion allowance. Resort for such remedy must be to Congress.

For all of these reasons judgment will be entered in favor of the defendant upon submission by counsel of a proper order. This opinion incorporates the findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure No. 52(a).

### APPENDIX I

## AMENDMENT TO THE REVENUE ACT OF 1939

### THE TEXTUAL LEGISLATIVE LANGUAGE

"§ 114. Basis for depreciation and depletion

\* \* \*

"(b) Basis for depletion

\* \* \*

"(4) Percentage depletion for coal, ~~bauxite, fluorspar, flake, graphite, vermiculite, beryl, mica, talc (including pyrophyllite), lepidelite, spodument, barite, ball, sagger and china clay, rock asphalt, phosphate rock, trona, bentonite, gilsonite, thenardite,~~ and metal mines, ~~potash~~ and ~~sulphur~~ *for certain other mines and natural mineral deposits—*

"(A) In general. The allowance for depletion under section 23(m) *in the case of the following mines and other natural deposits shall be—*

"(i) *in the case of sand, gravel, slate, stone (including pumice and scoria), brick and tile clay, shale, oyster shell, clam shell, granite, marble, sodium chloride, and, if from brine wells, calcium chloride, magnesium chloride, and bromine, 5 per centum.*

"(ii) in the case of coal, ~~mines~~ *asbestos, brucite, dolomite, magnesite, perlite, wollastonite, calcium carbonates, and magnesium carbonates, 10 per centum.*

"(iii) in the case of metal mines, aplite, bauxite, fluorspar, flake, graphite, vermiculite, beryl, *garnet*, feldspar, mica, talc (including pyrophyllite), lepidolite, spodumene, barite, ~~ball, sagger and china~~ clay, *ball clay, sagger clay, china clay*, phosphate rock, rock asphalt, mines, trona, bentonite, gilsonite, thenardite, (~~from brines or mixtures of brines~~) *borax, fuller's earth, tripoli, refractory and fire clay, quartzite, diatomaceous earth, metallurgical grade limestone, chemical grade limestone and potash, mines or deposits, 15 per centum * * *.*" (Strike out indicates deletion from former section and italics indicates additions by the Revenue Act of 1951).

## APPENDIX II

REFRACTORIES. One of the definitions of the word "refractoriness" is "the capacity of a material to resist a high temperature." The non-metallic materials which have this property, and which are used for the construction of furnaces, are known as "refractories." Without them, high temperatures could not be confined or harnessed for industrial use, and it would be impossible to reduce iron, copper, aluminum and other metals from their ores. Without refractories, it would be impossible to produce chinaware, porcelain, glass, portland cement, steam power or steam generated electric power.

Refractories are made of a wide variety of raw materials, of which refractory fire clay and quartzite (a type of silica rock) are the ones used in largest quantities. Other refractory raw materials include kaolin, magnesite, chrome ore, the minerals olivine, diaspore, bauxite, kyanite, sillimanite, zircon, zirconia and others. Many of these are produced from mines and quarries in various parts of the United States; others come from foreign lands. Chrome ore, for example, is imported from Cuba, the Philippines, and South Africa.

Most refractories are used in the form of brick shapes, which vary greatly in size, form and composition, depending upon the service for which they are intended. The most wide-ly used size is the so-called "9-inch straight," measuring 9 inches by 4½ inches by 2½ inches. Bricks of this size are made of many different raw materials and formed by several processes. The weight of a 9-inch straight varies from as little as 2 pounds for some heat-insulating refractories to as much as 12 pounds for certain special products.

In addition to the preformed shapes, refractory products include finely ground refractories, used mainly as mortar for laying the shapes; and granular materials of various compositions, which serve mainly for forming furnace bottoms. They are also used for making repairs in furnace walls and bottoms.

In service, the one condition which practically all refractories must withstand is exposure to high temperatures, which may vary from about 1,000° to 4,000° F., depending upon the type of furnace, and the part of the furnace in which they are used. In addition, they may be called upon to withstand the sand blast action of dusts in rapidly moving furnace gases, the abrasive effects of moving furnace charges, the tendency toward cracking caused by rapid changes in temperature, and chemical attack by solids, liquid slags, or other molten materials, or furnace gases. Usually refractories must also sustain pressure.

To meet the various furnace conditions, refractories of many types have been developed. The types most widely used include fireclay, high-alumina, silica, basic and silicon carbide brick, and insulating firebrick.

Refractory fireclay brick of several classes are used commercially, classified in accordance with their "refractoriness" or ability to withstand high temperatures. The two types of silica refractories available commercially are referred to as "conventional" and "superduty." High-alumina refractories, which consist essentially of alumina and silica, are classed as 50, 60, 70, 80, 90, or 99 per cent alumina products. Of these, the refractories with the highest alumina content have the greatest resistance to high temperatures. Basic refractories include those made of magnesite, of chrome ore, of the mineral fosterite, or of mixtures of these. Insulating firebrick, of which there are several classes, are used

# 342

mainly to retard the flow of heat through furnace walls.

In the United States, the state which produces the largest amount of refractories is Pennsylvania; Missouri comes second. Other important producers are Maryland, New Jersey, Ohio, Kentucky, Indiana, Illinois, Alabama, Texas, Colorado, and California. In 1953, the value of the refractories used in the United States amounted to more than $324 million.

Bibliography.—Wilson, H., Ceramics-Clay Technology (New York 1928); Chesters, J. H., Steel Plant Refractories (Sheffield, Eng. 1941); Norton, F. H., Refractories (New York 1949); American Iron and Steel Institute and American Ceramic Society, Refractories Bibliography (Columbus 1950); Harbison-Walker Refractories Company. Modern Refractory Practice (Pittsburgh 1950).

J. Spotts McDowell,

Harbison-Walker Refractories Company, Pittsburgh, Pa.