**BLOOMINGTON LIMESTONE CORPORATION, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 18715.**

United States Court of Appeals, Seventh Circuit.

July 13, 1971.

---

Johnnie M. Walters, Asst. Atty. Gen., Tax Division, Daniel B. Rosenbaum, Atty., U. S. Dept. of Justice, Meyer Rothwacks, Grant W. Wiprud, Attys., Tax Division, Dept. of Justice, Washington, D. C., for defendant-appellant; Stanley B. Miller, U. S. Atty., of counsel.

William F. Welch, Indianapolis, Ind., W. Rudolph Steckler, Indianapolis, Ind., for plaintiff-appellee; McHale, Cook & Welch, Indianapolis, Ind., of counsel.

Before SWYGERT, Chief Judge, PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This case concerns the correct method of computing the gross income from mining of taxpayer, an integrated miner-manufacturer of limestone products, for depletion allowance purposes. Because the taxpayer in the taxable years sold only a small quantity of rough block limestone from its mines and shipped the rest to its mills for fabrication processing, it must compute its mining income "constructively" according to Treasury Regulation § 1.613–3 and its predecessor. The district court, 315 F.Supp. 1255, found that the taxpayer had established "representative market or field prices" for the various grades of raw limestone. The government contends that it is impossible to establish such representative prices because of the variation of quality within each grade, and insists that the taxpayer must use the alternative proportionate profits method. If the taxpayer did establish representative market or field prices, the government argues that the prices it used are invalid under the presumption of § 1.-

613–3(c) (6), or were computed incorrectly.

The taxpayer, Bloomington Limestone Corporation, brought this suit in the district court for the refund of income taxes paid for the years 1955, 1956, and 1958, a total of $75,153.70 plus interest. The government had disallowed deductions from taxpayer's gross income for 1958 and 1959, claimed as the mining depletion allowance under 26 U.S.C. § 611(a).

The applicable regulation, 1.613–3(c) (1),[1] allows the taxpayer to fix the price at which it could have sold its ore, before the application of nonmining processes, through the use of actual sales by the taxpayer or its competitors. Oolitic limestone is sold in Indiana according to a grading system adopted by the Indiana Limestone Institute. The classifications are based on color and texture of the stone, as well as on length and clarity. "Long length" refers to stone five feet or longer without seams or flaws. "Short length" or "cull" stone is either clear but shorter than five feet, or longer but with one seam in the block. "Housing" stone is a five-foot block with more than one seam, or a shorter block with any seams.

The government challenges the adequacy of the grading system to meet the requirement of the regulation that the representative price be based on the sale of ore of "like kind and grades." Section (c) (2) of the regulation states that ore is of like kind and grade if it is "economically suitable for use for essentially the same purposes. * * * *" The government cites testimony that some purchasers of rough block limestone select individual stones to meet architects' specifications; this fact allegedly makes establishment of a representative price impossible, since the taxpayer might sell individual stones at a higher price than other stones in the same classification could or did command. Thus the government argues that taxpayer's calculation, based on the actual sales of five competitors, must be an overstatement of the price for which it could have sold all its rough block limestone.

■ Despite this argument, the district court found that the taxpayer could properly rely on the industry-wide grading and pricing system to establish representative prices for the limestone shipped to its mills. We believe the district judge's finding conforms with numerous judicial decisions that a representative market or field price need not be based on comparisons among virtually identical products.

---

1. (c) *Sales after the application of nonmining processes including nonmining transportation where a representative market or field price for the taxpayer's ore or mineral can be ascertained*—(1) *General rule.* If the taxpayer processes the ore or mineral before sale by the application of nonmining processes (including nonmining transportation), gross income from the property shall be computed by use of the representative market or field price of an ore or mineral of like kind and grade as the taxpayer's ore or mineral after the application of the mining processes (if any) actually applied and before any nonmining transportation, subject to any adjustments required by paragraph (e) of this section. The objective in computing gross income from the property by the representative market or field price method is to ascertain, on the basis of a study of actual competitive sales by the taxpayer, or others, the dollar figure or amounts which most nearly represents the approximate price at which the taxpayer, in light of market conditions, could have sold his ores or minerals if, prior to the application of nonmining processes, the taxpayer has sold the quantities and types of ores and minerals to which he applied nonmining processes. If it is possible to determine a market or field price under the provisions of this paragraph, and if such price is determined to be representative, the taxpayer's gross income from the property shall be determined on the basis of such price and not under the provisions of paragraph (d) of this section. The taxpayer's own actual sales prices for ores or minerals of like kind and grade shall be taken into account when establishing market or field prices, provided that such sales are determined to be representative.

In Alabama By-Products Corp. v. Patterson, 258 F.2d 892 (5th Cir. 1958), cert. denied, 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303 (1959), the taxpayer argued that only "interchangeable" coals were of like kind and grade. Because of the many distinguishing physical and chemical properties of coking coal, no representative price could be established. The court rejected that theory in holding that all Birmingham bituminous coal having coking properties for commercial usage is coal of like kind and grade. "Like kind" is a "broad phrase contemplating the distinction between classes of property," and does not permit differentiation according to the use to which the property is actually put.[2] 258 F.2d at 898. The court verified the government's establishment of a representative price.

In United States v. Henderson Clay Products, 324 F.2d 7 (5th Cir. 1963), cert. denied, 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964), the government argued there was no representative price because taxpayer's clay was not of like kind and grade as clay sold for ceramics because it was mined less selectively. In disagreeing, the court noted that the regulation does not require comparison with "the same" or "identical" products.

In comparable cases involving oil and gas depletion allowances, the Court of Claims has refused to limit comparative markets for the purpose of ascertaining representative prices. A producer selling gas in an intrastate market had to figure its gross income using lower prices at which other producers were selling in interstate markets. Hugoton Production Co. v. United States, 349 F. 2d 418, 172 Ct.Cl. 444 (1965). Another producer with wells in the three-state Hugoton Embayment was not allowed to divide the Embayment along state lines to compute a representative market price. The court said that the relevant market need not "further be fragmented by artificial political boundaries due to the presence (and disappearance) of one of the many economic factors at work." Panhandle Eastern Pipe Line Co. v. United States, 408 F.2d 690, 703, 187 Ct.Cl. 129 (1969).

Thus the courts have allowed neither physical characteristics nor end use nor conditions of marketing to narrow the class of products to be used in reaching comparative prices. The district court was correct in finding the existence of a well-established representative market or field price for taxpayer's rough block limestone.

The government urged the district court to apply a 1968 regulation, § 1-613–3(c) (6).[3] This regulation creates a presumption that a price is not representative if the price plus the cost of all nonmining processes regularly exceeds the actual sales price of the finished product. The theory of the presumption

2. The Tax Court has also rejected the "end-use test" in a different context. The 1939 Code provided for depletion allowances at different rates for categories of metals such as "dolomite," "quartzite," and "chemical grade limestone." Int. Rev.Code of 1939, § 114(b) (4) (A). The government tried unsuccessfully to vary the percentages according to the use to which the various metals were put. Virginian Limestone Corp. v. Commissioner of Internal Revenue, 26 T.C. 553 (1956) ; Spencer Quarries, Inc. v. Commissioner of Internal Revenue, 27 T.C. 392 (1956) ; Iowa Limestone Co. v. Commissioner of Internal Revenue, 28 T.C. 881 (1957).

3. (6) *Limitation on gross income from the property computed under the provisions of this paragraph.* It shall be presumed that a price is not a representative market or field price for the taxpayer's ore or mineral if the sum of such price plus the total of all costs of the nonmining processes (including nonmining transportation) which the taxpayer applies to his ore or mineral regularly exceeds the taxpayer's actual sales price of his first marketable product or group of products. See paragraph (d) (1) (iv) of this section for the definition of the term "first marketable product or group of products." For example, if the total of all costs of nonmining processes applied by the taxpayer to coal for the purpose of making coke is $12 per ton, and if the taxpayer's actual sale price for such coke is $18 per ton, a price of $7 per ton would not be a representative market or field price for the taxpayer's coal. In order to rebut the presumption set forth in the first sentence of this subparagraph, evidence

is that an integrated miner-manufacturer which shows year after year of profit from its mining operation and year after year of loss from its manufacturing operation must be overestimating the price of its raw product, and therefore overestimating the expenses of its manufacturing phase. The hypothesis is that no business would continue a milling operation which resulted in actual losses over a number of years.

The district judge found the presumption inapplicable to taxpayer, because Bloomington Limestone's records showed "no pattern of milling losses." Taxpayer submitted two sets of data on this issue: exhibits 16 and 17 chart profits and losses for 1951 through 1968, using taxpayer's list prices to estimate the price of rough block limestone; exhibits 24 and 25 give similar data for 1958 through 1968, but the list prices are reduced by 15 percent.[4] The government attorney did not object to the admission of these exhibits, nor did he cross-examine taxpayer's treasurer about their contents. The government now protests that nothing in the record supports taxpayer's use of 15 percent as the adjustment rate for 1960–1968 prices, but we think it was reasonable for the district court to accept the unchallenged estimates to determine whether a pattern of milling losses existed.

Exhibits 16 and 17 show mining profits for each of the 18 years and manufacturing profits for only six of those years. Exhibits 24 and 25, using the representative price adjustment, show mining profits for eight of the 11 years

and manufacturing profits for six. Taxpayer's president testified that the manufacturing losses in 1958 and 1959 were caused by depressed market conditions which improved after 1963. He said Bloomington Limestone closed one mill and cut down operations in others in 1958 and 1959, but continued operating the mills at a loss in the hope that the market would change.

We believe this evidence is sufficient to support the finding that manufacturing losses were not regular enough to activate the presumption of § 1.613–3(c) (6).

The government cites three cases where courts have adjusted or rejected a representative market or field price because it did not accurately reflect the economics of taxpayer's business. In Henderson Clay Products v. United States, 377 F.2d 349 (5th Cir. 1967), the proposed representative price included expenditures made by companies selling clay in the ceramics market. Taxpayer did not compete in that market and made no similar expenditures for advertising, management, and research. In the second case, the proposed representative price for Howell Field gas sold near the wellhead had to be reduced by transportation and delivery costs reflected in the comparative market prices. Panhandle Eastern Pipe Line Co. v. United States, 408 F.2d 690, 187 Ct.Cl. 129 (1969). There is no comparable evidence that other limestone companies' prices included expenses not incurred by Bloomington Limestone.

Gray Knox Marble Co. v. United States, 257 F.Supp. 632 (E.D.Tenn.

must be produced to establish to the satisfaction of the district director that the loss on nonmining operations is directly attributable to unusual, peculiar, and nonrecurring factors rather than to the use of a market or field price which is not representative. For example, the first sentence of this subparagraph shall not apply if the taxpayer establishes in an appropriate case that the loss on nonmining operations is directly attributable to unusual, peculiar, and nonrecurring events such as a fire, flood, explosion,

earthquake, strike, or a similar event which is not a normal part of the operations of the taxpayer.

4. The district court found the representative market or field price, based on the actual sales of rough block limestone by taxpayer's competitors, to be approximately 15 percent lower than taxpayer's list prices for 1958 and 1959. He used the lower prices to compute gross income. Taxpayer reduced its list prices by 15 percent in computing profits and losses for 1960 through 1968.

1966), superficially resembles the present case. But Gray Knox showed mining profits and very substantial manufacturing losses for each of eight years; Bloomington Limestone had manufacturing profits for more than half the years between 1958 and 1968. Gray Knox's competitors sold relatively small quantities of unfinished marble compared with manufactured products; Bloomington's competitors sold over $2 million of rough stone in each taxable year. Architects' specifications for marble in Gray Knox appear to be more stringent than for linestone, so that high-quality marble slabs are more often selected individually and at premium prices. Gray Knox's theory of representative prices assumed that the company used its best grade marble in its manufacturing process, but the evidence did not support the assumption.

*Gray Knox's* finding that the proposed price did not accurately represent the economics of the marble industry is compatible with the district court's finding here. Bloomington Limestone's representative price is not the sort of inflated or manipulated calculation which courts have found to take undue advantage of Congress' generosity in granting depletion allowances.[5]

█ The government's final contention is that the district court committed clear error in adopting taxpayer's computation of the volume of limestone quarried. The taxpayer, of course, had the burden of proving that its figures for each category of rough stone were accurate. See South Jersey Sand Co. v. Commissioner of Internal Revenue, 267 F.2d 591, 593 (3rd Cir. 1959); Harbison-Walker Refractories Co. v. United States, 227 F.Supp. 328, 332 (W.D.Pa. 1958), aff'd 340 F.2d 410 (3rd Cir. 1964); Rock Hill Quarries Co. v. United States, 217 F.Supp. 324, 326 (E.D.Mo. 1963). The figures must represent the price of the limestone at the point where

mining ends. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960).

Apparently the only records taxpayer maintained of rock leaving the quarry classify the blocks as either "clear" or "cull." In order to subdivide its quarried stone as to color and texture as well as to length and clarity, taxpayer worked backwards from sales invoices of finished and semifinished stone. For example, a finished, clear stone with an invoice marked "standard buff" would be classified as a product of a standard buff, *long-length* rough block.

The government challenges this method of calculation and points to the testimony of several witnesses that there is no way to tell whether an individual finished stone came from a clear block or a seamed one, since slabs may be cut to avoid the seam.

If the taxpayer's method is fallacious, one would expect a discrepancy between the quarry-production figures and the sales-invoice figures, the latter showing a higher percentage of the expensive long-length blocks. This discrepancy is precisely what the government proved in exhibits AQ and AR, which were compiled from records furnished by the taxpayer. These exhibits demonstrate that the taxpayer claims to have sold or shipped to its mills 25,700 cubic feet more long-length rough stone than it had available from production and inventory in 1958; in 1959 the discrepancy is 73,298 cubic feet. For both years there is a corresponding amount of cull stone "lost" from inventory—that is, an excess of cull stone produced over the amount which appears in sales or inventory records.

█ The conclusion is inescapable that taxpayer has overstated its gross income by categorizing too much of its quarried stone as the higher-priced long-length. There is no evidence in the record nor argument in the briefs to ex-

---

5. By affirming the district judge's holding that the presumption of § 1.613–3(c) (6) does not apply, we find it unnecessary to review his alternative holdings that the regulation is not retroactive, or if retroactive, is invalid as violative of the statutory mandate of § 611.

plain the discrepancies; the taxpayer never disputed the figures or calculations in exhibits AQ and AR. The district court's finding that taxpayer had met its burden of proof on this element of its case is therefore "clearly erroneous" under Rule 52(a), Fed.R.Civ.P.

The government suggests that taxpayer's inaccurate figures require a complete reversal of the case and the application of the proportionate profits method of calculating gross income. Certainly for the future the government can require a taxpayer using the representative price method to prove its production from records kept at the quarry. But we feel it is not fair to penalize this taxpayer (who has proved the existence and accuracy of representative prices) for not maintaining precise detail of quarry production prior to being placed on notice by this proceeding.

We shall therefore adjust taxpayer's gross income from mining by eliminating the discrepancies proved in exhibits AQ and AR. By removing 25,700 cubic feet (1958) and 73,298 cubic feet (1959) from the most expensive long-length categories and revaluing the stone at the price of the least expensive short-length stone, we find the gross income for 1958 to be $428,661.85 and for 1959 to be $449,504.81. (See Addendum.)

The case is reversed and remanded to the district court with directions to calculate taxpayer's tax liability based on the adjusted figures for gross income from quarry production.

Taxpayer shall recover two-thirds of its costs on appeal from the government.

#### Addendum

##### 1958

| | | |
|---|---|---|
| Discrepancy from exhibit AQ | 25,700 | cu. ft. |
| Price of long-length select buff | $2.11 | |
| | $54,227 | |
| Discrepancy from exhibit AQ | 25,700 | cu. ft. |
| Price of short-length variegated | $ .56 | |
| | $14,392 | |
| Difference    $54,227 — $14,392 = $39,835 | | |
| Gross income per sales invoices | $468,496.85 | |
| Difference | — 39,835.00 | |
| Adjusted gross income | $428,661.85 | |

##### 1959

| | | |
|---|---|---|
| Discrepancy from exhibit AR | 10,600 | cu. ft. |
| Price of long-length select buff | $ 2.03 | |
| | $21,518 | |
| Discrepancy from exhibit AR | 62,698 | cu. ft. |
| Price of long-length standard buff | $1.76 | |
| | $110,348.48 | |
| Total   $21,518 + $110,348.48 = $131,866.48 | | |
| Discrepancy from exhibit AR | 73,298 | cu. ft. |
| Price of short-length variegated | $ .57 | |
| | $ 41,779.86 | |
| Difference   $131,866.48 — $41,779.86 = $90,086.62 | | |
| Gross income per sales invoices | $539,591.43 | |
| Difference | — 90,086.62 | |
| Adjusted gross income | $449,504.81 | |